UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| NANCY S. KEETCH and RODNEY A. KEETCH,<br><br>    Plaintiffs,<br><br>  vs.<br><br>SAXON MORTGAGE SERVICES, INC., a Texas Corporation; OCWEN LOAN SERVICING, LLC, a Delaware Limited Liability Company; SPECIALIZED LOAN SERVICING LLC, a Delaware Limited Liability Company; EQUIFAX INFORMATION SERVICES, LLC, a Georgia Limited Liability Company; EXPERIAN INFORMATION SOLUTIONS, INC., an Ohio Corporation; and TRANS UNION LLC, a Delaware Limited Liability Company;<br><br>    Defendants. | NO. CV-13-0332-JLQ<br><br><br>**ORDER RE: CIVILITY** |

    At the telephonic scheduling conference held on November 19, 2013, the court expressed concern as to the lack of civility in certain filings in this matter and explained to counsel its expectation that professionalism, courtesy, and civility will endure throughout these proceedings, including in all written submissions.   Attached to this Order is the court's so-called "Civility Memo" (and attached article) as well as a more recently authored article by the recent Past President of the Washington State Bar Association, Michele Radosevich, entitled "Civility: Just Be Nice?" (published in NW Lawyer (Feb. 2013)) available at http://nwlawyer.wsba.org/nwlawyer.

ORDER - 1

Each attorney listed as counsel of record in this case shall file a Declaration in this matter attesting that he or she has read this Order and its attachments. Counsel may, but are not required to, include in the Declaration that attorney's intent to avoid incivility in this action.

**IT IS SO ORDERED**. The Clerk is hereby directed to enter this Order and furnish copies to counsel.

DATED this 19th day of November, 2013.

                s/ Justin L. Quackenbush
                JUSTIN L. QUACKENBUSH
       SENIOR UNITED STATES DISTRICT JUDGE

ORDER - 2

United States District Court
Eastern District of Washington
949 United States Courthouse
P. O. Box 1432
Spokane, Washington 99210-1432
(509) 353-2180
FTS 439-2180

Justin L. Quackenbush
Senior Judge

# MEMORANDUM

TO: ATTORNEYS PRACTICING IN THE COURT OF
JUDGE JUSTIN L. QUACKENBUSH

FROM: SENIOR JUDGE JUSTIN L. QUACKENBUSH

DATE: October 20, 1997

RE: CIVILITY

I recently read an excellent article by Judge John G. Koeltl of the Southern District of New York which was published in the Litigation Section of the American Bar Association publication, Spring, 1997.

Judge Koeltl's background is impressive ranging from having served as a Law Clerk to a federal court district judge and thereafter being a Law Clerk for Supreme Court Justice Potter Stewart. He then served as an Assistant Special Prosecutor in the Watergate matter. At the time of his appointment to the federal bench in 1994 Judge Koeltl was a partner in the law firm of Debevoise & Plimpton.

Judge Koeltl's thoughts in the attached article are very similar to those which I have had on many occasions in the 18 years I have been a federal judge and I commend a thorough reading of Judge Koeltl's article to federal practioners, particularly those who appear before me.

# Litigation

The Journal Of The Section Of Litigation · American Bar Association

Vol. 23 No. 3 Spring 1997



## Winners



# From the Bench

## by John G. Koeltl

U.S. District Judge for the Southern District of New York

Incivility is counterproductive. Lawyers should be civil in litigation not only because it is the right way to practice law—which it is—but also because lawyers hurt their clients and themselves by being mean-spirited, nasty, rude, and generally uncooperative with their adversaries and the court. While I was in private practice, I was active in promoting a local code of civility, and I appreciated the value of civility in litigation. Some measure of civility is required under rules that, for example, limit obstreperous objections or require attorneys to confer in good faith before presenting certain issues to the court.

Civility is also important because it is the most efficient and economical way to litigate cases. When time is consumed with exchanges of venomous correspondence, or with discovery disputes, clients may well pay more to have their cases litigated because additional hours are spent in unproductive trench warfare. As a private lawyer, I also understood that civility was a way of making the practice of law enjoyable. When lawyers cooperate, litigation can be exciting and challenging; but when lawyers constantly bicker, lawyers can view each day with dread, waiting for the next piece of hate mail to come off the fax.

But it was only when I became a judge that I was able to appreciate fully how lawyers harm their clients and themselves by acting boorishly. Incivility in litigation will become known to the court, even if it occurs in correspondence between the parties or in discovery proceedings. When a court or jury sees incivility, it will be viewed as a sign of weakness rather than strength, and as an effort to obstruct rather than to present the facts and the law fairly. The result is that the lawyer's presentation will be received with skepticism rather than trust. The lawyer will have undermined the lawyer's own credibility and ability to persuade the court or the jury.

I define civility very broadly. It certainly includes avoiding the "Rambo" style scorched-earth policy that seeks the broadest possible discovery from the other side and seeks to provide the least possible discovery from your client. Under this Rambo approach, when seeking discovery, no document, (no matter how tangential) goes unrequested; no interrogatory (no matter how burdensome) goes unasked; and no witness (no matter how remote) goes undeposed. On the other hand, when resisting discovery, perfectly straightforward document requests and interrogatories are resisted on the grounds that they are "vague, ambiguous, overbroad, not calculated to lead to the discovery of admissible evidence, and otherwise objectionable." Depositions are resisted through fights over scheduling.

But civility includes much more. It is a basic attitude of dealing with people, including adversaries and witnesses, in a polite and courteous manner, both orally and in writing. It means being cooperative at all stages of the litigation, when that can be done without sacrificing the legitimate interests of the client.

Consider how incivility actually plays out before the court and why it is so counterproductive. One of the first contacts the court may have with a litigation is correspondence on the subject of the time for the defendant to move or answer. There are some counsel who make it a practice not to grant extensions of time to move or answer, or who will not agree to an extension of time to make a motion to dismiss, or who condition an extension of time on a waiver of a defense such as improper service or lack of personal jurisdiction. Jack Curtin, a former President of the American Bar Association, once explained that he told new clients that his practice was always to grant any reasonable extension of time to move or answer, and that if the client was not prepared to do that, the client should hire another lawyer. A senior trial lawyer in New York once told me that his response to a lawyer who would give an extension of time only to answer but not to make a motion was to tell the lawyer that it was all right; that fellow could keep his extension of time to answer because the court would give an extension of time for all purposes.

Some codes of civility now recommend that a first request for an extension of time to move or answer should



be given unconditionally, unless there is a special circumstance. It is a terrible way to make a first impression on the court to be on the wrong end of correspondence in which a lawyer is resisting a first request for an extension of time to move or answer, or in which it appears that the lawyer is seeking an unfair procedural advantage by refusing to give an extension of time to move or to answer. The reasons offered for resisting an extension may also appear to be



hollow and disingenuous, like the proffered reason that the lawyer was told by his client not to grant an extension or that the lawyer was "trying to move the case along." The most likely result of the correspondence would be a memo endorsement granting the extension, and a loss of credibility for the lawyer who refused to grant a complete extension in the first place.

The first contact that the parties may have with the court may also be a dispute about service of process. It should be obvious that if a defendant is amenable to service, acrimonious correspondence over whether the defendant was properly served and whether the lawyer is authorized to accept service, or whether a process server should hunt the defendant down, is unproductive. The defendant will eventually be served, and all that the attorney has accomplished is a delay. Why would a lawyer want to begin a case before a court with heated and self-serving correspondence over whether the defendant was properly served?

Compare that with a lawyer who comes to a conference and explains to the court that the client was not properly served but there was no question the client could be served and the lawyer would assist in making sure that the issues of service were resolved. The lawyer who resists service will appear to be attempting to duck the merits of the case. The lawyer who cooperates conveys to the court a willingness to address the merits or lack of merits of the case. The lawyer who resists undermines confidence in that lawyer's position. The lawyer prepared to deal with the merits begins to build the lawyer's credibility with the court.

The initial conference with the court provides the court with the opportunity to understand the case and also to assess the counsel in the case. Everything that a lawyer does before the court contributes to the impression that the court has of the lawyer: whether the lawyer can be trusted and relied upon to state the facts and the law fairly or whether the lawyer's representations have to be taken with considerable skepticism. The most effective lawyer is one who appears to be fair and credible, confident of the client's position, and above pettiness and grasping for unwarranted advantage.

Some lawyers approach conferences not with the spirit of candor and cooperation that promotes confidence in their position, but with an aggressive mean-spiritness that cannot reasonably be considered persuasive. It is self-evident that a lawyer should wait for the opportunity to speak, address the court directly rather than the other attorney, and not attempt to interrupt either the court or the opposing counsel.

While these propositions seem clear, many lawyers simply ignore them. Some lawyers routinely interrupt other lawyers at conferences—until told to stop it—as though they would not be afforded the opportunity to speak when their turn came. Some lawyers appear to think that if they do not correct something another attorney says immediately, and promptly label it a misrepresentation, the court will be fooled by the statement. Some lawyers, whether in conferences or in court, believe that if they disagree with a proposition, the way to disagree is to vigorously shake their head back and forth like a puppet indicating that the proposition is wrong. All that these attorneys accomplish is to look silly and annoy the court. There are other conferences where attorneys begin to address each other as though they were contestants on a television talk show and the judge was a moderator.

None of these approaches engenders confidence. They mark the lawyers as insecure with their positions and unwilling to wait and persuade the court as to the obvious merit of their positions. I contrast those approaches with the many superb lawyers who wait to speak and express their positions briefly and self-confidently. On several occasions, after listening to expansive explanations, I have had an excellent lawyer say in substance that the short answer is that the other lawyer is simply mistaken on the facts or the law, or both, and that this lawyer will explain why if the court wants to hear it, otherwise the lawyer is prepared to brief it. That is a far more persuasive approach than the disruptive head shaking attitude of less civil lawyers.

After the initial conference, the regular contact that the court may have with the parties is through discovery disputes. I generally handle discovery disputes myself because I want to understand what is happening in the case. The court's willingness to review discovery disputes may also promote cooperative discovery and discourage the need for judicial intervention. I have had cases where the parties announced early on that there would be discovery disputes and asked for the appointment of a magistrate judge to referee the disputes. I have declined and told the parties that if they have disputes I want them to bring them to me so that I could see how reasonable or unreasonable they were acting. The disputes did not arise.

Much of the acrimonious and self-serving correspondence that is exchanged among counsel—particularly discovery correspondence—would not be sent if lawyers took a

(Please turn to page 66)

make themselves believe that men who work are not quite human. They do like you did, Bigger, when you refused to feel sorry for Mary. But on both sides men want to live; men are fighting for life. Who will win? Well, the side that feels life most, the side with the most humanity and the most men. That's why . . . y-you've got to b-believe in yourself, Bigger . . . ."

Bigger saw Max back away from him with compressed lips. But he felt he had to make Max understand how he saw things now.

"I didn't want to kill!" Bigger shouted. "But what I killed for, I *am*! It must've been pretty deep in me to make me kill! I must have felt it awful hard to murder. . . ."

Max lifted his hand to touch Bigger, but did not.

"No; no; no. . . Bigger, not that . . . ." Max pleaded despairingly.

"What I killed for must've been good!" Bigger's voice was full of frenzied anguish. "It must have been good! When a man kills, it's for something . . . I didn't know I was really alive in this world until I felt things hard enough to kill for em. . . .It's the truth, Mr. Max. I can say it now, cause I'm going to die. I know what I'm saying real good and I know how it sounds. But I'm all right. I feel all right when I look at it that way . . . ."

Max's eyes were wet. Slowly, he extended his hand. Bigger shook it.

"Good-bye, Bigger," he said quietly.
"Good-bye, Mr. Max." 🔲

# From the Bench

*(Continued from page 4)*

moment to consider how that correspondence would appear to the court if the court received a copy of it. The court will often see the correspondence because someone will attach it to some motion at some point in the litigation.

I recall one case that was reassigned to me. The parties were engaged in acrimonious correspondence with mutual allegations of bad faith about carrying out discovery obligations. I called all counsel in for an initial conference and explained to the lawyers—senior, distinguished, and excellent trial lawyers—that the correspondence was unworthy of them and should not continue. A senior trial lawyer rose and explained that the correspondence had unfortunately become heated recently but that the lawyer could speak for all of the lawyers in the room in representing to the court that, henceforth, the lawyers would no longer engage in that type of invective in any correspondence—that was copied to the court. I



began to explain that the lawyer did not get the whole point. The lawyer stopped me, held up a hand, and said, "Just joking, Your Honor, just joking." Touche.

I am sometimes called on to resolve disputes concerning depositions, and I see transcripts of depositions attached to motion papers. I also see transcripts when depositions are marked for reading at trial. It is surprising that lawyers continue to engage in improper deposition tactics when they should appreciate that the transcript may eventually be reviewed by a court. Transcripts with those improper tactics can only undercut the credibility of the lawyers who engage in such tactics.

The major involvement of the court in a civil case prior to trial may well be the disposition of substantive motions, whether initial motions to dismiss or ultimate motions for summary judgment. Civility is one of the factors that distinguishes persuasive motion papers and oral arguments from self-destructive ones. Motion papers should be straightforward, nonbombastic, and noninsulting. Judges are impressed by a clear statement of the facts and the explanation of the law. Judges are not impressed by papers that hurl epithets against the other side.

Memoranda that are personally insulting to an adversary are also offensive to the court. Why would a judge want to spend time reading briefs that accuse the other side of "outrageous misrepresentations," or that state "with great reluctance" that the other side has "deliberately misstated" the law? Briefs are sometimes loaded with adjectives that describe the other side's arguments as "ludicrous," "incredible," "frivolous," and worse. These motions sometimes describe the adversary as well as the adversary's argument.

Page limits are sometimes insufficient to cabin all the adjectives, so lawyers try to circumvent the rules by squeezing the margins or reducing the font size. All of this is counterproductive. Judges would rather understand the facts and the law than waste time seeing a lawyer being insulted. If an attorney can show why a fact is false or an argument is wrong on the law, the judge can draw any appropriate conclusions about the lawyer who presented the facts or made the argument. Ridiculing the other attorney will not help the court to reach that conclusion.

Similarly, at oral argument on motions, personal invective has no place. I have seen lawyers waste time criticizing the opposing lawyer or client for various transgressions. Some lawyers project an impression of being mean and petty because they emphasize how the other side misunderstood the law or the facts, or how the other side has only grudgingly come to acknowledge some facts or some cases. It is difficult to see how sarcasm could be persuasive as a legal argument and yet it is repeatedly used. Far more persuasive are those lawyers who do not pound the opposition, but attempt to explain to the court why the facts and the law compel the result the attorney is seeking.

During pretrial proceedings, civility works because it helps to persuade the court that the lawyer is arguing for a position that is right on the facts and the law, that the lawyer is confident that position is correct and will prevail, and that the lawyer does not have to stoop to dilatory or mean tactics in order to prevail. At trial, the lawyer's credibility is even more important. The factfinder, whether the court or the jury, will have to decide disputed issues of fact. The lawyer can be a helpful guide to the factfinder, showing the reasonable and credible view of the evidence. It should be clear that lawyers who present them-

selves as mean, nasty, rude, and sarcastic are risking their credibility and their ability to serve as fair guides to the evidence. Yet, this is precisely what some lawyers do.

This is not to say that lawyers should be genteel with respect to all witnesses. Trial situations are infinitely varied, and the trial process has been analogized to brain surgery for its complexity. There are some witnesses that a lawyer can cross-examine by showing in a forthright way that the witness was not in a very good position to observe events or had physical problems that prevented that witness from being able to observe the events. A lawyer can cross-examine a witness by showing that the witness may have innocently failed to recall accurately. It is easier to accept that a witness is innocently mistaken than that a witness is a perjurer. It hardly makes sense for a lawyer to attempt by sarcasm, innuendo, or badgering to show that the witness is a deliberate liar when it is better and more persuasive for the lawyer to show that the witness is simply mistaken.

But there are other witnesses whose testimony is so at odds with a client's testimony, or the testimony of other witnesses, that the only realistic approach is to suggest that the witness is deliberately lying. The very difference in attitude that the lawyer takes to such a witness will emphasize disbelief for the witness's testimony, providing that the lawyer has not tried to show that all of the witnesses for the other side were deliberate liars. But even with those witnesses who must be discredited for deliberately false testimony, the lawyer can conduct the examination without giving the impression that the lawyer is wallowing in the mud with the witness. I have seen lawyers shout at witnesses so much that the jury winced. I have seen lawyers attempt to humiliate witnesses with sarcasm, when the only thing they accomplished was to make the jury feel sorry for the witness and dislike the lawyer.

On the other hand, I have seen relentless destruction of witnesses—without sneering, condescension, or sarcasm—by showing, for example, ways in which the witness's testimony could not have been truthful when compared to undisputed facts in documents or surveillance tapes. This is not the place to review all the techniques for cross-examination, about which volumes have been written. It is plain, however, that cross-examination can be used effectively, even against witnesses whom a lawyer believes to be deliberately lying, without the lawyer losing control of the examination and using counter-productive techniques, such as sarcasm, which have the potential to backfire on the lawyer.

Similarly, in closing arguments, the court or the jury wants to hear what the evidence has shown. Some lawyers have used closing arguments for personal attacks on the lawyers on the other side. They have argued that a lawyer on the other side did not prove what was promised in the opening statement, or did not bring out some evidence at trial, with the plain implication that the lawyer was being dishonest. Some lawyers have also used summation for personal attacks on witnesses. Some of these arguments are well-founded with respect to the credibility or candor of certain witnesses, and in some cases are absolutely essential. The more vicious the attack, however, the greater the danger that the jury will discredit the attacker. A scalpel is more effective than a butcher knife.

With all of the disadvantages and risks of incivility throughout the litigation process, from discovery through trial, why do some lawyers persist with such conduct? I believe that there are numerous reasons. Some persons act that way out of inexperience and lack of confidence. Some people believe that because they are engaged in an adversary process it is necessary to fight every battle, seek everything the law allows, and resist giving up everything that can be resisted. This springs from a failure to appreciate what is really important in the litigation and what the case will truly turn on, whether it be disposed of by motion or at trial. Experienced and self-confident lawyers analyze the case early, understand what the real issues are, and are perfectly prepared to cut through the minutiae to get to the real issues on which the case will turn.

Some lawyers I suspect are uncivil because their clients explicitly or implicitly expect it of them. Some clients want to make sure that their lawyers are tough, uncompromising, dogged, and unrelenting. For those lawyers who are otherwise inclined to take such guidance from their clients, they should explain that incivility will not get results, it will only be counter productive. ◻

# Trial Notebook

(Continued from page 48)

process, you analyze through stories.

"The story is the basic mechanism people have for dealing with information—facts, ideas, principles.

"Since the beginning, humans have used stories to teach, to understand, to memorialize events, to pass on moral precepts, to make sense out of the world.

"Doubt it? Go back to law school and take contracts for the first time.

"Only this time you don't have any cases—they're stories. No examples, no hypotheticals. They're stories. All you have are the black-letter principles in the Restatement of Contracts. Do you think you could get through the course?

"Sure. But it would take a long time—maybe years. And the way you would do it would be to make up your own examples—your own stories—to try to make sense out of the rules. And maybe they would fit and maybe they wouldn't.

"One of the things we have learned is that when you give people raw information with no story line, they make up their own stories to explain what happened. They invent characters who drive the story and even give them names. And these characters all have reasons—motives—for the things they do.

"One of the most interesting things is, when people fasten on a story like this, they don't even 'hear' the facts that don't fit their story."

"That is impressive," said Sandy. "It sounds like I really ought to tell a story in all of my pleadings, so I can get the judge to start thinking along the right lines from the very start. Do you really think it makes that much difference?"

"Hard to say," said Angus. "Some of us think so. Some of us feel that every motion, pleading, brief, or memorandum ought to tell a trial-winning story. Not that the pleadings are the equivalent of a good opening statement. They can't be that well developed or complete. But if they get the judge taking your side from the beginning they can make a real difference." ◻

Michele Radosevich
WSBA President

President's Corner

# Civility: Just Be Nice?



Probably more has been written to less effect about civility than almost any other topic for lawyers. Law is adversarial. We want to win. We believe that's what our clients are paying us for, and we owe them our best efforts.

What kind of effort is best? It depends on the contest. Chess and wrestling are both adversarial, but the winning strategies are different. Lawyers sometimes like to compare litigation to armed conflict. We tell "war stories" and engage in "battle." We conduct "frontal assaults" and "ambushes."

But a trial is not a battle. Our legal system was meant to resolve disputes without resorting to weapons. I like to think of it as a truth-testing method, a way of arriving at a reasonably accurate set of facts to which the law can be applied. How many times have we congratulated ourselves at wringing an admission from an opposing party in their deposition or at trial, only to find ourselves shocked at the words coming out of our own client's mouth on cross-examination? The formality of the setting, the oath, and the questions of opposing counsel often produce a more nuanced version of reality than the one heard in the lawyer's office.

The lawyer can affect the proceeding in a number of ways. First and most importantly, she can know her case inside out and prepare her witnesses to present it. This aspect is pretty un-warlike. Preparing witnesses involves more nurturing than directing.

Cross-examination, however, provides an opportunity for aggression. We've all worked with lawyers who tried to intimidate opposing witnesses. If you are good at intimidation, you can undermine the witness's confidence and affect his demeanor. But this doesn't always work to your advantage. At trial, the judge or jury may see you as a bully and sympathize with the witness.

In a deposition, the tactics that intimidate are pretty much the opposite of the open-ended questions that elicit new information. By using these tactics, you forgo the opportunity to learn as much as possible about what the witness knows and is likely to say at trial. So intimidation is, at best, a two-edged sword when applied to opposing parties.

How about opposing counsel? Judging from the sheer number of uncivil statements by opposing counsel to one another, you would think these statements must confer some sort of advantage. To the best of my recollection, I cannot remember a single time in my career when that was true. Shouting at opposing counsel or questioning their honesty is likely to result in cutting off all communication that is not absolutely necessary — and relegating that to email. You then won't have an opportunity to talk your way through scheduling issues and discovery deadlines, where a little cooperation can sometimes make both you and opposing counsel much happier. And it is much more difficult to settle the case.



There are a few lawyers who question the honesty of opposing counsel in front of the judge. There may be a thin line between pointing out that your opponent has taken a quote out of context and asserting that your opponent has deliberately misrepresented the facts of the case, but most of us can find — and appreciate — that line. The character attack may fluster an opponent, but if the judge is offended, it can also have an adverse impact on the attacker.

Some lawyers engage in this kind of behavior because they believe clients expect it. We've all been asked by friends for recommendations for a really aggressive lawyer to take on a case. But we don't let our clients tell us how to do our job. Instead, we explain to clients the best and most effective ways to achieve their objectives. Incivility toward opposing parties and their lawyers is simply not an effective way to win. It is an unpleasant distraction at best, and at worst, has a significant risk of backfiring.

At the end of the day, the biggest victim of incivility is the lawyer who practices it. Repeated unpleasant encounters with other attorneys have an effect on one's reputation within the legal community. But they also have an effect on the uncivil lawyer. In a recent column about civility in politics, David Brooks, of *The New York Times*, observed: "Smart people who've thought about this usually understand that the habits we put in practice end up shaping the people we are within." Brooks went on to quote Edmund Burke: "Man-

### Promoting Civility and More
### The Work of the WSBA Professionalism Committee



The WSBA Professionalism Committee is committed to assisting attorneys in fostering better client relations, improving civility within the legal community, and developing a better public image for the profession. Programs and activities include:

**LAW SCHOOL OUTREACH** — Committee members, along with WSBA staff, give presentations about professionalism in professional responsibility classes at the three Washington law schools.

**MEMBER OUTREACH** — The committee has made presentations on professionalism topics to the Tacoma-Pierce County Bar Association, the Washington State Association for Justice, and other legal groups.

**CREED OF PROFESSIONALISM** — Developed by the Professionalism Committee and adopted by the WSBA Board of Governors in 2001, the Creed is displayed in courtrooms and law offices across the state.

**RANDOM ACTS OF PROFESSIONALISM PROGRAM** — This program allows lawyers and judges to honor others in the profession who have conducted themselves in a highly professional manner consistent with the spirit of the Creed of Professionalism.

**ROBERT'S FUND** — The committee is working in collaboration with Robert's Fund, which offers CLEs in both Washington state and Italy on civility in the legal profession.

*To learn more about these efforts and the work of the Professionalism Committee, go to www.wsba.org/profcomm or contact committee chair Hunter Abell at habell@williamskastner.com.*

ners are of more importance than laws. Manners are what vex or soothe, corrupt or purify, exalt or debase, barbarize or refine us, by a constant, steady, uniform, insensible operation, like that of the air we breathe in."

Politeness is a discipline that compels respectful behavior, according to Brooks. As lawyers, we know this. By formalizing and ritualizing conflict, we work through it. When we instead personalize the conflict, we make it more difficult to resolve. Our clients are entitled to efficient and effective conflict resolution, not to a particular result. We therefore have a duty to the system to be polite and respectful that is inseparable from our duty to our clients. Civility is not about being nice, it's about being effective. NWL

---

WSBA President MICHELE RADOSEVICH practices in Seattle. She can be reached at micheleradosevich@dwt.com or 206-757-8124. Read more from Michele at nwsidebar.wsba.org, the blog for Washington's legal community.



SKWC
STRITMATTER KESSLER WHELAN COLUCCIO

"How wonderful it is that nobody need wait a single moment before starting to improve the world."
~ Anne Frank

The State and City blamed each other for the dangerous bridge. But did nothing. SKWC has helped make it safer for all.

Learn more about Lacey's story at Stritmatter.com

**Real Justice for Real People**

Seattle 206.448.1777 | Hoquiam 800.540.7364 | www.stritmatter.com

Lacey Hicks, survived after a rusted out lightpole crashed onto her car on the Chehalis River Bridge.